```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3-26-15
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BAMUNDO, ZWAL & SCHERMERHORN, LLP,

                Plaintiff,

-v-

SENTINEL INSURANCE COMPANY, LTD.,

                Defendant.

No. 13-cv-6672 (RJS)
OPINION AND ORDER

RICHARD J. SULLIVAN, District Judge:

    Plaintiff Bamundo, Zwal & Schermerhorn, LLP – a law firm located in lower Manhattan – brings this breach of contract action against Defendant Sentinel Insurance Company, LTD., in connection with Defendant's denial of coverage for Plaintiff's loss of business income following Superstorm Sandy ("Sandy") in October 2012. Now before the Court are the parties' cross-motions for summary judgment. For the reasons stated below, Defendant's motion for summary judgment is granted, and Plaintiff's cross-motion for partial summary judgment is denied.

I. Background[1]

A. Facts

    Plaintiff is a New York law firm which leases office space at 111 John Street in Manhattan. (Defendant's Rule 56.1 Statement, Doc. No. 23 ("Def. 56.1"), ¶ 1.) Defendant issued insurance

---

[1] The following facts are taken from the parties' Local Civil Rule 56.1 Statements, the affidavits and declarations submitted in connection with the instant motion, and the exhibits attached thereto. Unless otherwise noted, where one party's 56.1 Statement is cited, the other party does not dispute the fact asserted, has offered no admissible evidence to refute that fact, or merely objects to inferences drawn from that fact. In deciding this motion, the Court also considered Defendant's memorandum of law in support of its motion (Doc. No. 24 ("Def. Mem.")), Plaintiff's memorandum of law in opposition to the motion and in support of Plaintiff's cross-motion (Doc. No. 33 ("Pl. Mem.")), Defendant's opposition to Plaintiff's motion and reply brief (Doc. No. 36 ("Def. Rep.")), and Plaintiff's reply brief (Doc. No. 37 ("Pl. Rep.")).

coverage to Plaintiff for one year beginning on February 15, 2012 (the "Policy"). (*Id.* ¶ 26.) Under the relevant provisions of the Policy, Defendant agreed to pay for "the actual loss of Business Income you sustain when access to your 'scheduled premises' is specifically prohibited by order of a civil authority as the direct result of a Covered Cause of Loss to property in the immediate area of your 'scheduled premises[2]'" (the "Civil Authority provision"). (*Id.* ¶ 27.) The Policy provided that coverage for business income under the Civil Authority provision "will begin 72 hours after the order of a civil authority," and that such coverage ends "at the earlier of: (a) when access is permitted to your 'schedule premises'; or (b) 30 consecutive days after the order of the civil authority." (*Id.*) A Covered Cause of Loss is further defined as a "risk of direct physical loss unless the loss is" excluded. (*Id.*) The Policy excluded payment of any "loss or damage caused directly or indirectly by" water, including flooding (the "Flood Exclusion"). (*Id.* ¶ 28.)

On October 28, 2012, in anticipation of Sandy and "weather conditions [that] are likely to cause heavy flooding [and] power outages," the Mayor of New York City (the "Mayor") issued Executive Order 163, which ordered the public to evacuate all homes and businesses located in Zone A, an evacuation zone covering parts of lower Manhattan. (Doc. No. 25-9, at 2–4 ("Order 163").) Plaintiff's office was located in Zone A in October 2012.[3]

On October 29, 2012, Sandy made landfall, reaching "its full intensity" that evening when "never-before-seen flood levels" began to surge over Manhattan. (*See* Con Edison's "Report on

---

[2] Neither party disputes that the "scheduled premises" refers to Plaintiff's office located on 111 John Street.

[3] Plaintiff assumes but does not offer evidence to support the fact that 111 John Street is in Zone A. Nevertheless, the Court takes judicial notice of the fact that 111 John Street was in Zone A in October 2012. *See United States v. Hernandez-Fundora*, 58 F.3d 802, 811 (2d Cir. 1995) ("Geography has long been peculiarly susceptible to judicial notice for the obvious reason that geographic locations are facts which are not generally controversial." (internal quotations marks omitted)); *see also* New York City Hurricane Evacuation Zones, *N.Y. Times*, (Oct. 28, 2012), http://www.nytimes.com/interactive/2012/10/28/nyregion/hurricane-evacuation-zones.html (listing 111 John Street as being located in Evacuation Zone A in October 2012).

Preparation and System Restoration Performance – Sandy – October 29 through November 12, 2012," Doc. No. 35, Ex. 15 ("Con Edison Performance Report"), at 5.) On October 31, 2012, after recognizing that "a severe storm hit New York City . . . causing heavy flooding," the Mayor issued Executive Order 165, which continued the evacuation order in Order 163 and stated that the public may reoccupy buildings in Zone A "only upon [a] determination by the Department of Buildings that re-occupation is permitted." (Doc. No. 25-9, at 5–8 ("Order 165").) On November 1, 2012, the New York City Buildings Commissioner issued a press release which stated that the public would not be permitted to reoccupy buildings in Zone A until either the Department of Buildings inspected and authorized reentry or a licensed professional engineer certified that the building was safe to occupy, had no standing water, and had electricity, among other things. (Doc. No. 17-42.) In light of the flooding of parts of lower Manhattan, the Mayor subsequently issued fourteen more executive orders between November 5, 2012 and January 4, 2013, which continued the evacuation of Zone A. (*See* Doc. Nos. 25-9, 25-10, 25-11 (attaching Executive Orders 168, 171, 176, 177, 181, 184, 189, 192, 195, 198, 201, 204, 208, and 211).)

On December 21, 2012, licensed engineer David Glickman told the Department of Buildings that 111 John Street was "structurally sound" and "safe to occupy." (Def. 56.1 ¶ 21.) Subsequently, the tenants of 111 John Street were told that the building would be "fully available for occupancy" on December 24, 2012. (*Id.* ¶ 22.) Nevertheless, Plaintiff did not reenter its office until January 4, 2013. (*Id.* ¶¶ 2–3.) As a consequence of the evacuation orders, Plaintiff submitted an insurance claim to Defendant for its loss of business income spanning almost the entire evacuation period, from October 30, 2012 to January 4, 2013.[4] (*Id.* ¶¶ 3–4.) In response,

---

[4] Although Plaintiff never clearly indicates when it first began incurring a loss of business income, the First Amended Complaint alleges that Plaintiff "was completely unable to conduct business activities" starting on "October 29/30, 2012." (Doc. No. 5, ¶ 12.) However, Plaintiff does not dispute paragraph 2 of Defendant's Rule 56.1 Statement,

3

Defendant denied coverage, asserting that Plaintiff "incurr[ed] a business interruption as the result of flooding conditions." (Doc. No. 17-35.) Plaintiff responded to the denial of coverage and noted that 111 John Street "did not suffer any flood damage" and that Plaintiff was entitled to coverage under the Civil Authority provision. (Doc. No. 17-36.) Defendant never responded to that letter. (Pl. Mem. at 3.)

B. Procedural History

On August 25, 2013, Plaintiff commenced this action in New York State Supreme Court, New York County, seeking payment of its business income losses from October 30, 2012 until January 4, 2013 as allegedly required under the Policy. (Doc. No. 1.) On September 20, 2013, this action was removed to federal court on diversity grounds. (*Id.*) On October 13, 2013, Plaintiff filed an amended complaint, asserting claims against Defendant for breach of contract, bad faith and unfair claim settlement practices, and a violation of New York General Business Law § 349. (Doc. No. 5 ("First Amended Complaint" or "FAC").) Plaintiff voluntarily dismissed the New York General Business Law claim on December 6, 2013. (Doc. No. 16.)

On August 28, 2014, Defendant moved for summary judgment to dismiss the First Amended Complaint. On September 26, 2014, Plaintiff filed its own cross-motion for partial summary judgment, arguing that the Policy requires Defendant to pay for Plaintiff's loss of business income.[5] The motions were fully briefed on October 24, 2014.

---

stating that "Plaintiff alleges that it sustained . . . loss of business income because it was unable to occupy its offices from October 30, 2012 until January 4, 2013." (Def. 56.1 ¶ 2.) The Court relies on this undisputed Rule 56.1 Statement, which states that Plaintiff is asserting a claim for loss of business income starting on October 30, 2012.

[5] Plaintiff improperly filed its cross-motion for partial summary judgment and its memorandum of law in support of its motion, resulting in an ECF notice that directed Plaintiff to refile these documents. (Doc. Nos. 30, 31.) Plaintiff properly refiled its memorandum of law, but failed to properly refile its actual motion. (Doc. No. 33.) Nevertheless, the Court treats Plaintiff's properly refiled memorandum of law also as a cross-motion for summary judgment. *Cf. Phx. Global Ventures, LLC v. Phx. Hotel Assocs., Ltd.*, 422 F.3d 72, 76 (2d Cir. 2005) ("[T]he strictures of the ECF system are not, strictly speaking, local rules of the district court. But if a district court has inherent authority to waive its local rules, which have the 'force of law,' then *a fortiori* it has the inherent authority to waive quirks of its

II. STANDARD OF REVIEW

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted). "Conclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), as well as the existence of a mere "scintilla of evidence in support of the [nonmoving party's] position," *Anderson*, 477 U.S. at 252, are insufficient to create a genuinely

---

procedural mechanisms, which do not even rise to the level of legal requirements. We therefore . . . permit district courts to excuse failures to comply with rules enforced by its local electronic case filing system for purposes of determining when a motion was made." (citation omitted)).

5

disputed fact. A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party "'show[s]' – that is, point[s] out . . . – that there is an absence of evidence [in the record] to support the nonmoving party's [position]," *see Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). When interpreting terms in a contract, a court may grant a motion for summary judgment "where the agreement's language is unambiguous and conveys a definite meaning." *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1094 (2d Cir. 1993).

### III. DISCUSSION

#### A. Breach of Contract Claim

Under New York law, "an insurance contract is interpreted to give effect to the intent of the parties as expressed in the clear language of the contract." *Vill. of Sylvan Beach, N.Y. v. Travelers Indem. Co.*, 55 F.3d 114, 115 (2d Cir. 1995).[6] The insured bears the initial burden of showing that the insurance contract covers the alleged loss. *See Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 276 (2d Cir. 2000). If the insured meets that burden and the insurer seeks to avoid coverage, the insurer bears the burden of showing that an exclusion to the coverage applies. *Id.* at 276 n.1; *see also Seaboard Sur. Co. v. Gillette Co.*, 64 N.Y.2d 304, 311 (1984) ("[B]efore an insurance company is permitted to avoid policy coverage, it must satisfy the burden which it bears of establishing that the exclusions or exemptions apply in the particular case, and that they are subject to no other reasonable interpretation." (citations omitted)). Any exclusions from coverage "must be specific and clear in order to be enforced" and "are to be

---

[6] Although neither party has addressed choice of law, the briefs assume New York law, and such "implied consent to use a forum's law is sufficient to establish choice of law." *Tehran-Berkeley Civil & Envtl. Eng'rs v. Tippetts-Abbett-McCarthy-Stratton*, 888 F.2d 239, 242 (2d Cir. 1989).

accorded a strict and narrow construction." *See Pioneer Tower Owners Ass'n v. State Farm Fire & Cas. Co.*, 12 N.Y.3d 302, 306–07 (2009) (internal quotation marks omitted). If the exclusion is ambiguous, "the ambiguity must be interpreted in favor of the insured." *Vill. of Sylvan Beach*, 55 F.3d at 115; *see also* 2 Couch on Insurance § 21:1 (3d ed. 2014).

Here, the principal dispute between the parties turns on whether the Policy's Civil Authority provision applies where the evacuation order was prompted by flooding, or perhaps more precisely, whether the term "Covered Cause of Loss" used in the Civil Authority provision (and elsewhere in the Policy) incorporated the Flood Exclusion. Although the burden of proof could shift depending on exactly how the question is presented, in reality the issue as to which party bears the burden is of no moment, since the language of the Policy is wholly unambiguous. As noted above, the Civil Authority provision allows Plaintiff to recover its lost business income when access to its office "is specifically prohibited by order of a civil authority as the direct result of a Covered Cause of Loss to property in the immediate area" of Plaintiff's office. (Def. 56.1 ¶ 27.) Here, there is no question that Plaintiff's access to its office was specifically prohibited by order of a civil authority. The only issue is whether that order of the civil authority was "the direct result of a Covered Cause of Loss to property in the immediate area" of Plaintiff's office. The answer to this question for the October 31 order and all subsequent evacuation orders is clearly "no," for the simple reason that "Covered Cause of Loss" is defined in the Policy to exclude loss due to flooding.

It is undisputed that Sandy flooded parts of Manhattan. (*See, e.g.*, Con Edison Performance Report at 5–6.) Moreover, it is clear that this flooding *directly* caused the Mayor to issue Order 165 on October 31, 2012, and the subsequent evacuation orders, that prohibited Plaintiff from reoccupying its office until December 24, 2012. (*See, e.g.*, Order 165 (keeping the evacuation of

Zone A in place in light of the "severe storm [that] hit New York City in recent days, *causing heavy flooding*" (emphasis added)); Doc. No. 25-9 (noting in Executive Orders 168, 171, and 176 that "a severe storm hit New York City recently, *causing heavy flooding*" and continuing the evacuation of Zone A (emphasis added)); Doc. No. 25-10 (noting in Executive Orders 181, 184, 189, 192, 195, and 198 that "a severe storm hit New York City recently, *causing heavy flooding . . . [and] widespread damage to buildings and infrastructure in Zone A*" and continuing the evacuation of Zone A (emphasis added)); Doc. No. 25-11 (reprinting the same italicized language in Executive Orders 201, 204, 208, and 211).) Therefore, because access to Plaintiff's office was "specifically prohibited" by the Mayor's evacuation orders, which were issued "as a direct result" of flooding of "the immediate area" of Plaintiff's office in Zone A, the October 31 order and the subsequent evacuation orders do not fall under the Policy's definition of a Covered Cause of Loss and do not permit recovery for Plaintiff's loss of business income under the Civil Authority provision. *See Johnson Gallagher Magliery, LLC v. Charter Oak Fire Ins. Co.*, No. 13-cv-866 (DLC), 2014 WL 1041831, at *2, *8–10 (S.D.N.Y. Mar. 18, 2014) (reviewing an insurance policy with a covered cause of loss definition and flood exclusion that is nearly identical to the present case and finding that a power shutdown at the insured's office due to "extensive water damage" of the power supply company was "an excluded cause of loss"). Put simply, because the evacuation orders were the direct result of flooding in Zone A, they were, by definition, *not* the direct result of a "Covered Cause of Loss to property in the immediate area," since Plaintiff's policy expressly excluded flooding from the definition of a Covered Cause of Loss. The Civil Authority provision thus does not apply, and Plaintiff is not entitled to business income lost as a result of the October 31 evacuation order and all subsequent orders.

Of course, Plaintiff could seek to recover lost business income resulting from the October 28 order. That order – unlike the October 31 order and all subsequent evacuation orders – was a preemptive evacuation based not on flooding but on the risk of future flood damage and power outages. *See Newman Myers Kreines Gross Harris, P.C. v. Great N. Ins. Co.*, 17 F. Supp. 3d 323, 333–34 (S.D.N.Y. 2014) (holding that a flood exclusion did not apply to deny coverage for the insured because the insured's loss resulted from a power shutdown of the insured's office in light of the risk of *future* flood damage, not actual flooding). However, any claim for damages incurred between the October 28 order and the October 31 order would be defeated by Section q(2) of the Policy, which provides that coverage under the Civil Authority provision "will begin 72 hours after the order of a civil authority." (Def. 56.1 ¶ 27.) Based on this provision, the earliest date on which Plaintiff would be entitled to recover lost business income resulting from the October 28 order would have been October 31 – 72 hours after the initial order. But by that date, Order 163 had already been superseded by Order 165, which clearly *was* based on actual flooding in the immediate area of Plaintiff's office. Accordingly, Plaintiff's lost business income is not covered by the Policy, and Defendant is entitled to summary judgment on Plaintiff's breach of contract claim.[7]

### B. Bad Faith and Unfair Claim Settlement Practices Claim

In addition to its breach of contract claim, Plaintiff asserts a cause of action for "bad faith and unfair claim settlement practices," alleging that Defendant "breached its duty of good faith and fair dealing by [its] conscious disregard of the Plaintiff's interests and [its] deliberate failure

---

[7] The parties do not address whether the end date of coverage should have been (1) November 27, 2012, which is thirty days after Order 163, (2) December 24, 2012, which was the first day that Plaintiff was permitted to reenter its office, or (3) January 4, 2013, which is the day that Plaintiff claims it was able to reoccupy its office. (*See* Def. 56.1 ¶ 27 (noting that coverage under the Civil Authority provision ends the earlier of when access is permitted to Plaintiff's premises or 30 consecutive days after the civil authority order).) Because, as set forth above, the Court finds that Plaintiff is not entitled to any coverage in the present action, the Court need not address this issue.

9

to honor [its] obligations under" the Policy. (FAC ¶ 17.) The Complaint does not clearly indicate whether Plaintiff is asserting a statutory cause of action under New York Insurance Law ("NYIL") § 2601 for unfair settlement practices or a common law cause of action for breach of the implied duty of good faith and fair dealing. Under either cause of action, however, Plaintiff's claim must be dismissed. First, New York does not currently recognize a private cause of action under NYIL § 2601. *See Rocanova v. Equitable Life Assur. Soc. of U.S.*, 83 N.Y.2d 603, 614 (1994); *Kings Infiniti Inc. v. Zurich Am. Ins. Co.*, 990 N.Y.S.2d 437 (Sup. Ct. Kings Cnty. 2014). Second, New York law "does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013) (citation and internal quotation marks omitted). Accordingly, when a plaintiff alleges "both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant." *Id.*; *see also Giller v. Oracle USA, Inc.*, 512 F. App'x 71, 73 (2d Cir. 2013) (same). Here, the Court has already determined that Defendant did not breach the Policy when it denied coverage under the Civil Authority provision. Furthermore, Plaintiff has provided no support for its claim beyond the few conclusory allegations in the First Amended Complaint. Therefore, the Court finds that Defendant did not act in bad faith or otherwise breach the implied covenant of good faith and fair dealing, and that Defendant's motion for summary judgment on the claim for bad faith and unfair claim settlement practices must be granted.

IV. CONCLUSION

For the reasons set forth above, IT IS HEREBY ORDERED THAT Defendant's motion for summary judgment as to the First Amended Complaint is GRANTED. IT IS FURTHER

ORDERED THAT Plaintiff's motion for partial summary judgment is DENIED. The Clerk of the Court is respectfully directed to terminate the motions located at docket numbers 20 and 22 and to close this case.

SO ORDERED.

Dated: March 26, 2015
New York, New York

_____
RICHARD J. SULLIVAN
UNITED STATES DISTRICT JUDGE